No. 26-20161

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
RECEIVED
Oct 08, 2026
FIFTH CIRCUIT

DEBORAH KAY SWAN,
Plaintiff-Appellant,

v.

DEPUTY W. SHIELDS, individually and in his official capacity;
MONTGOMERY COUNTY, TEXAS; and
MONTGOMERY COUNTY CONSTABLE PRECINCT 3,
Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
Civil Action No. 4:25-cv-02799

# APPELLANT'S REPLY BRIEF

Deborah Kay Swan
Plaintiff-Appellant, Pro Se
Spring, Texas

## CERTIFICATE OF INTERESTED PERSONS

The undersigned pro se Appellant certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiff-Appellant: Deborah Kay Swan.

Defendants-Appellees: Deputy W. Shields; Montgomery County, Texas; Montgomery County Constable Precinct 3.

Counsel for Appellees: Daniel Plake, Montgomery County Attorney's Office.

District Judge: Hon. Keith P. Ellison, United States District Judge, Southern District of Texas.

Court Reporter: Monica Walker-Bailey.

The undersigned is not aware of any parent corporations or publicly held corporations owning 10 percent or more of any party.

# TABLE OF CONTENTS


| | |
|---|---|
| Certificate of Interested Persons | 2 |
| Table of Contents | 3 |
| Table of Authorities | 4 |
| Reply Argument | 5 |
| Background Before Shields Became Involved | 5 |
| I. District Court Error One: The Court Adopted Appellees' Manipulated Framing Instead of Swan's Pleaded Claims | 8 |
| II. The Record Shows Swan Objected to the Same Distortion Throughout the Case | 12 |
| III. Plake's Wrong Law, Case-Law Framing, and Qualified-Immunity Arguments Were Preserved | 23 |
| IV. Dismissal With Prejudice Was Improper | 30 |
| Conclusion | 32 |
| Certificate of Service | 34 |
| Certificate of Compliance | 35 |

# TABLE OF AUTHORITIES


| | |
|---|---|
| Arnold v. Williams, 979 F.3d 262 (5th Cir. 2020) | 20, 24 |
| Erickson v. Pardus, 551 U.S. 89 (2007) | 16 |
| Johnson v. City of Shelby, 574 U.S. 10 (2014) | 12, 16 |
| Jones v. Greninger, 188 F.3d 322 (5th Cir. 1999) | 22, 30 |
| Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002) | 17, 28 |
| Monell v. Department of Social Services, 436 U.S. 658 (1978) | 21 |
| Paul v. Davis, 424 U.S. 693 (1976) | 18, 26 |
| Rolf v. City of San Antonio, 77 F.3d 823 (5th Cir. 1996) | 17, 25, 26 |
| Schultea v. Wood, 47 F.3d 1427 (5th Cir. 1995) | 20, 24, 26 |
| Skinner v. Switzer, 562 U.S. 521 (2011) | 12, 16 |
| Texas v. Thompson, 70 F.3d 390 (5th Cir. 1995) | 19, 26 |
| Tolan v. Cotton, 572 U.S. 650 (2014) | 12 |
| United States v. Sineneng-Smith, 590 U.S. 371 (2020) | 16 |
| Federal Rule of Civil Procedure 12(b)(6) | 14, 30 |
| Federal Rule of Civil Procedure 46 | 12 |

# REPLY ARGUMENT

## BACKGROUND BEFORE SHIELDS BECAME INVOLVED

The timeline before Shields became involved is important because it shows why Appellees' report-accuracy framing changes the case. Swan's record evidence did not begin with Shields, a mental-health call, or a police report. It began with suspected cyber intrusion, physical tracking concerns, and Swan's attempt to obtain law-enforcement help before any mental-health narrative existed.

The docket contains the May 21, 2024 email from Detective Jeff Durrenberger. In that email, Durrenberger advised Swan to gather her evidence, including IP addresses, phone conversations, text messages, Google searches, names and addresses of suspects or related persons, and to provide the trackers and all physical evidence. He advised her to call and file a report with the agency serving her area and to provide the responding unit the evidence packet. ROA.453. That email matters because it shows Swan was not inventing a mental-health story. She was following a law-enforcement detective's direction before Shields became involved.

The record also shows that Swan discovered her email accounts had been accessed hundreds of times without authorization on May 15, 2024, and that the access logs included IP addresses traced to individuals residing in her neighborhood. ROA.973-974. After reviewing her evidence, a Montgomery County detective confirmed that the conduct constituted a criminal offense and advised her to contact local law enforcement to file an official report. ROA.974.

Swan then did exactly that. She contacted local law enforcement, and deputies, including Deputy Vera, came to her home. According to the record, they refused to take a report and merely advised her to change her password. No investigation was opened and no official report was filed, even though Swan was trying to report cyber intrusion and tracking concerns before Shields ever became part of the matter. ROA.974; see also ROA.451-452.

When the cyber activity continued, Swan reviewed her email-login records and prepared written notices to six nearby residences connected to the unauthorized access. ROA.974-975. Her sworn record statement explains that the notices were non-confrontational and were intended to document the concern and deter further unauthorized access. ROA.975. After the letters were received, the hacking and unauthorized activity logs stopped immediately. ROA.975.

Only after that did the June 7 welfare check occur. Officer Holman conducted that visit alone, the encounter was peaceful and non-confrontational, and Holman told Swan he had been asked to check on her because of the letters. ROA.975. Holman remained for approximately ten minutes, saw no cause for concern, told Swan how to obtain the call information, cleared the welfare check, and left. ROA.975. The transcript also shows Swan explained to Holman that she had proof of private email activity, that two officers had already come out and told her to change her password, and that she wanted a report made. ROA.451-452.

After Holman left and after Swan requested the dispatch records, Swan discovered that Shields, who had not been present, contacted

dispatch and directed the notation that Swan was a 10-96 with political delusions. ROA.975. That is the dividing line the district court and Appellees blurred. Before Shields, the record showed a citizen following a detective's instruction, trying to report cyber intrusion and tracking evidence, calling for help first, and receiving only password advice from responding officers. Shields entered later and converted the matter into a mental-health/political-delusion record.

This appeal should not be decided from Appellees’ rewritten version of the case. The threshold question is whether the district court dismissed Swan’s pleaded claims or a substituted claim Appellees created and repeated. Swan’s pleadings and objections show that this case is not about dictating the words of a police report. It is about an officer who the Appellant has never met or even spoke with. This officer has never been to her house, yet caused official law-enforcement and dispatch/CAD records to classify her as a code 1096 mental-health subject, with “political delusions” after the actual responding officer cleared the welfare check.

Appellees’ response brief repeats the same misdirection that Swan objected to throughout the district-court record. Appellees argue against an “accurate police report” claim, a “dictate report content” claim, and a reputation-only claim. Those are not Swan’s claims. Swan pleaded First Amendment retaliation, Fourteenth Amendment stigma-plus due process, Monell liability, false official records, and prospective relief directed at ongoing governmental records and the absence of any correction process.

That distinction controls the appeal. If the Court accepts Appellees' version first, the same error will repeat on appeal. But if the Court begins with the complaint, the preserved objections, and the Nov. 19 hearing transcript, the record shows a consistent and preserved issue: Appellees changed the cause of action, Swan objected, and the district court dismissed under Appellees' version anyway.

## I. DISTRICT COURT ERROR ONE: THE COURT ADOPTED APPELLEES' MANIPULATED FRAMING INSTEAD OF SWAN'S PLEADED CLAIMS.

The central error is direct: the district court dismissed a case Swan did not plead. Appellees converted Swan's constitutional claims into a report-editing claim, and the district court adopted that version even after Swan objected repeatedly in the docket and at oral argument.

### Swan Did Not Plead a Freestanding Right to an Accurate Police Report

Swan did not plead a freestanding constitutional right to an accurate police report. That characterization strips away the sequence of events actually alleged and replaces Swan's claims with a materially different theory.

The events began when Swan discovered two GPS tracking devices on her vehicle and evidence indicating that her private email accounts had been accessed without her authorization. Swan reported those matters to law enforcement.

Deputy Shields was not the officer who responded to that report, and Swan did not speak with Shields about it. The responding officers were Christian Vera and another officer. They came to Swan's residence,

spoke with her concerning what she had discovered, advised her to change her passwords, and left.

Swan subsequently reviewed information from her account-security records identifying locations associated with the unauthorized access. Based upon that information, Swan contacted nearby residents whose locations appeared in those security records and delivered letters notifying them of what she had discovered.

After Swan delivered those letters, the unauthorized activity stopped. The accessing of her accounts ceased.

The following day, however, Swan was unexpectedly visited by a mental-health officer for a welfare check.

At that point, Swan did not know what had caused law enforcement to treat the situation as a mental-health matter. Officer Harry Holman responded to the welfare check. Holman personally met Swan, spoke with her, and observed her condition. Shields did not come to Swan's residence and was not present for that encounter.

Holman remained at Swan's residence for approximately seven minutes. He found no mental-health crisis requiring further intervention, cleared the call, and advised Swan that she could request the dispatch records to determine who had initiated the welfare check. The audio and transcript of that encounter were entered into the district-court record.

Swan followed Holman's advice and obtained the dispatch records.

Those records revealed information Swan could not have known when Holman arrived at her home: after one of the neighbors who had received Swan's letter contacted Deputy Shields, Shields contacted

dispatch and initiated the mental-health response concerning Swan.

This distinction is critical. Shields was not one of the officers who originally responded to Swan's report concerning the GPS trackers and unauthorized account access. He did not interview Swan concerning those events. He did not come to her residence. He did not speak with her. He did not personally observe her behavior or mental condition. According to Swan's allegations and the record she relies upon, Shields became involved only after a neighbor who had received Swan's letter contacted him.

Yet Shields caused the matter to be redirected into a mental-health response.

Even more significant, after Officer Holman—the officer who actually met and observed Swan—cleared the welfare check, Swan alleges that Shields communicated with dispatch and caused Swan's official law-enforcement records to reflect a "10-96" mental-health classification together with a reference to "political delusions."

The contrast is fundamental to Swan's claims: the officer who actually met Swan found no mental-health crisis and cleared her; the officer who never met, interviewed, or observed Swan caused the stigmatizing mental-health characterization to appear in the governmental record.

The challenged conduct also did not end with the initial welfare check. Swan alleged that the mental-health classification was subsequently repeated and maintained in official dispatch and law-enforcement records. She further alleged that there was no

meaningful procedure through which she could have the stigmatizing classification corrected or removed. Accordingly, Swan's case cannot fairly be reduced to a claim that a police report contained inaccurate information.

Her pleaded theory concerns the use of governmental authority to convert her reports and communications concerning unknown gps trackers on her vehicle and unauthorized access to her private accounts into a mental-health narrative; the placement and continued maintenance of a stigmatizing mental-health classification in official law-enforcement systems by an officer who had never personally evaluated her; the governmental dissemination and continuing consequences of that classification; the absence of a meaningful mechanism for correction; the resulting stigma-plus injury; First Amendment retaliation; and the municipal policy, practice, or custom that permitted those conditions to occur and continue.

The chronology matters. Swan reported suspected GPS tracking and unauthorized access to her accounts. Officers Vera and another officer responded and left after advising her to change her passwords. Swan then notified neighbors associated with locations appearing in her account-security information. After they were notified, all the unauthorized account activity stopped. The HOA director Cynthia Griffen, who received one of those letters then contacted Walter Shields. Walter Shields, without first meeting or interviewing Swan, immediately initiated a mental-health response. The officer Harry Holman, who actually responded and observed Swan found no mental-health crisis and cleared the call. Nevertheless, after the call was cleared and Holman

left, Walter Shields called dispatch and added to the report, a "10-96" mental-health classification and "political delusions" notation to be placed into and maintained within Swan's official law-enforcement records. Those are the allegations that must be evaluated.

Characterizing that pleaded course of conduct merely as an alleged constitutional "right to an accurate police report" removes the alleged retaliation, the sequence leading to Shields's involvement, the absence of firsthand knowledge, the stigmatizing governmental classification, its continued maintenance and dissemination, and the resulting deprivation from the analysis.

The district court's order shows the error. The court treated the case as the "entry of an incorrect code in a police report" and as "a police report alone, even if false." ROA.1139-40. That was Appellees' manipulated frame, not Swan's pleaded claim.

Rule 12 required the court to test Swan's pleaded factual theory, not Appellees' rewritten version. Johnson v. City of Shelby, 574 U.S. 10, 11-12 (2014); Skinner v. Switzer, 562 U.S. 521, 530 (2011); Erickson v. Pardus, 551 U.S. 89, 94 (2007); Tolan v. Cotton, 572 U.S. 650, 657 (2014). The party-presentation principle reinforces that courts decide the dispute presented, not a reformulated case. United States v. Sineneng-Smith, 590 U.S. 371, 375-76 (2020).

## II. THE RECORD SHOWS SWAN OBJECTED TO THE SAME DISTORTION THROUGHOUT THE CASE

SWAN OBJECTED TO THE SAME DISTORTION THROUGHOUT THE CASE**

Swan objected to it repeatedly before judgment.

In Dkt. 46, Swan responded directly to Defendants' report-accuracy characterization:

**“This misconstrues the claim.”**

ROA.416.

That was not a general objection. It identified the exact problem now before this Court.

In Dkt. 50, Swan again stated that she had:

**“systematically objected to Defendants' misrepresentations throughout this case.”**

ROA.473.

In Dkt. 52, Swan filed her Global Preservation of Objections under Rule 46 and preserved objections to Defendants' characterization of the facts, legal authorities, statutes, and arguments.

ROA.481–83.

In Dkt. 54, Swan made the issue unmistakable:

**“Defendants misstate that Plaintiff's case asserts only a ‘right to an accurate police report.’”**

ROA.506.

She expressly stated that the constitutional claims arose under the First and Fourteenth Amendments and were “not mere reporting.”

Id.

In Dkt. 84, Swan challenged Appellees' use of authorities concerning pleading standards, qualified immunity, false governmental records, and reputation through the wrong legal framework.

ROA.779–83.

And in Dkt. 114, Swan again objected that Defendants were mischaracterizing both constitutional claims. the First Amendment theory as a demand for investigation or report accuracy and the Fourteenth Amendment theory as reputation alone.

This was therefore not one objection buried in a large docket. It was the same objection, repeatedly preserved:

**Appellees were changing the conduct alleged before applying the law to it.**

That distinction matters on appeal because appellate review is ordinarily confined to issues presented to the district court. Keenan v. Tejeda, 290 F.3d 252, 262 (5th Cir. 2002). Here there is no preservation problem. The issue was presented repeatedly.

## THE NOVEMBER 19 HEARING ELIMINATES ANY POSSIBLE ARGUMENT THAT THE DISTRICT COURT DID NOT UNDERSTAND THE OBJECTION

Tr. 13–14.

She then stated:

**“This is not about me having an accurate police report.”**

Tr. 14.

She explained:

**“This is about fabrication of entries into my official dispatch that are false.”**

Id.

And again:

**“This is not about me wanting an accurate police report. This is about fabrication of government records, dispatch records, profiling me a 10-96.”**

Tr. 15.

Swan then explained the factual distinction: Shields had never met her or conducted the welfare check; Holman had actually responded and cleared the encounter; and the disputed mental-health information appeared in governmental records associated with Shields.

Tr. 11–15, 18, 38–43.

She separately identified the First Amendment, Fourteenth Amendment, Monell, and prospective-relief theories.

Tr. 38–43.

The district court therefore had three forms of notice:

the operative pleadings; the repeated written objections; and Swan's direct oral explanation. The court's final order also acknowledged Swan's numerous notices and objections and stated that they had been considered. ROA.1149 n.11.

Yet the constitutional analysis ultimately returned to the same formulation Swan had repeatedly challenged: “entry of an incorrect code in a police report,”

ROA.1139,

and:

**“a police report alone—even if false.”**

ROA.1140.

## WHY THE DISTORTED FACTUAL FRAME CHANGED THE GOVERNING LAW

The error mattered because Rule 12 required the district court to decide whether the facts Swan actually pleaded stated a plausible constitutional claim.

In Johnson v. City of Shelby, 574 U.S. 10, 11–12 (2014), the Supreme Court rejected dismissal based upon imperfect articulation of the legal theory where the factual allegations provided the defendants fair notice of the constitutional claim.

Erickson v. Pardus, 551 U.S. 89, 94 (2007), requires a pro se complaint to be liberally construed and its well-pleaded factual allegations accepted as true at the pleading stage.

Skinner v. Switzer, 562 U.S. 521, 530 (2011), likewise confirms that Rule 8 requires sufficient factual notice of the claim, not perfect legal formulation.

And United States v. Sineneng-Smith, 590 U.S. 371, 375–76 (2020), explains the ordinary party-presentation principle under which courts decide the controversy the parties present. Swan does not rely upon Sineneng-Smith for the proposition that a court may never identify the correct governing law. She relies upon it for the narrower point that a case should not be resolved upon a materially substituted controversy after the plaintiff repeatedly identifies the substitution.

That is what happened here. The district court did not merely describe Swan's allegations differently. The changed description altered the governing constitutional questions.

If the alleged conduct is merely an incorrect code in a police report, cases rejecting a freestanding constitutional entitlement to an accurate report become central. But if the alleged conduct is retaliatory governmental action involving mental-health/political classification in operational CAD/location/caution records after protected citizen activity, by an officer allegedly lacking firsthand knowledge, followed by continued governmental use and no meaningful correction mechanism, a different constitutional analysis is required.

That distinction affected every claim.

**FIRST AMENDMENT THE DISTORTION REMOVED THE ACTUAL RETALIATION CHRONOLOGY FROM THE ANALYSIS**

Keenan v. Tejeda, 290 F.3d 252, 258–61 (5th Cir. 2002), supplies the relevant Fifth Circuit framework for a private citizen alleging retaliatory law-enforcement conduct. Keenan requires protected activity, an injury sufficient to chill a person of ordinary firmness, adverse governmental action substantially motivated by the protected activity, and actual curtailment of the plaintiff's protected activity. Id. at 258–60. Keenan is especially relevant because the alleged retaliatory conduct there included law-enforcement activity following citizens' efforts to expose alleged misconduct. Id. at 256 & n.3.

Rolf v. City of San Antonio, 77 F.3d 823, 828 (5th Cir. 1996), likewise recognized that governmental retaliation against a private citizen for exercising First Amendment rights cannot be objectively reasonable.

Those authorities do not create a constitutional right to accurate governmental records. Swan has never claimed that they do. They demonstrate why the district court had to analyze retaliation rather than

report accuracy. The June chronology was relevant to each element. Swan engaged in reporting and petitioning activity concerning suspected tracking and electronic-account access. She communicated with nearby residents concerning information appearing in her account-security data. The CAD identifies Griffin as a recipient of one of those letters.

Shields then sought a mental-health unit. Holman actually responded.

Holman found no EDO criteria. Yet mental-health and "political delusions" information was thereafter placed into governmental location/caution notes.

The information was later involved in reopened and linked governmental incidents.

That is the chronology the court had to test against Keenan. If Swan insufficiently alleged actual curtailment or another Keenan element, the district court could identify that pleading deficiency. What it could not do was avoid the Keenan inquiry by converting the claim into a constitutional right to an accurate police report.

## FOURTEENTH AMENDMENT THE DISTORTION REMOVED THE ALLEGED "PLUS" AND PROCESS FROM THE ANALYSIS

Swan does not dispute Paul v. Davis, 424 U.S. 693, 701–12 (1976).

Reputation alone is insufficient. That is precisely why Appellees' reputation-only characterization matters. Under Fifth Circuit law, the court had to determine whether the alleged governmental stigma was accompanied by infringement of another protected interest. Blackburn v. City of Marshall, 42 F.3d 925, 935–36 (5th Cir. 1995).

Texas v. Thompson, 70 F.3d 390, 392 (5th Cir. 1995).

The alleged stigma was concrete:

**“10-96”**

and:

**“HAS POLITICAL DELUSIONS.”**

ROA.498–501.

But Swan alleged more. She alleged First Amendment retaliation connected to her reporting, petitioning, and communications. She alleged that the stigmatizing information was placed into operational location/caution information.

She alleged later governmental use and linking. She alleged that she invoked the County's complaint process. She alleged that she requested removal. And she alleged that a supervisory official told her he did not know how the information could be corrected or removed.

Whether those allegations ultimately satisfy the constitutional “plus” is the legal question the court needed to decide. Calling the case “a police report alone, even if false” removed the alleged additional governmental consequences and process allegations before the stigma-plus test was applied.

## QUALIFIED IMMUNITY PLAKE'S DISTORTED CLAIM PRODUCED THE WRONG CLEARLY-ESTABLISHED-LAW QUESTION

The same distortion materially changed qualified immunity.

The correct question was not: Was there clearly established law giving Swan a constitutional right to an accurate police report? Swan repeatedly said she asserted no such right. ROA.416; ROA.506; Tr.

14–15.

The court first had to identify the constitutional conduct actually alleged.

For the First Amendment theory, that meant determining whether Swan plausibly alleged retaliatory governmental action under Keenan and Rolf.

Only then could the court determine whether existing law clearly established the relevant constitutional prohibition in the particular factual context.

Appellees' substituted framing short-circuited that analysis.

And the pleading standard could not properly be heightened merely because qualified immunity was asserted. Schultea v. Wood, 47 F.3d 1427, 1433–34 (5th Cir. 1995) (en banc), permits a district court to require a Rule 7(a) reply tailored to qualified immunity when greater factual particularity is necessary.

It does not authorize replacement of the plaintiff's cause of action.

More recently, Arnold v. Williams, 979 F.3d 262, 267 (5th Cir. 2020), expressly explained that assertion of qualified immunity does not subject the complaint itself to a heightened pleading standard. Thus, if greater factual specificity was necessary to resolve immunity, the governing framework supplied a mechanism for obtaining it. The court did not need to, and could not properly, resolve immunity by changing the constitutional claim first.

**MONELL THE ATKINS EVIDENCE AND CONTINUING CAD HISTORY HAD TO BE ANALYZED UNDER THE ACTUAL MUNICIPAL THEORY**

Monell v. Department of Social Services, 436 U.S. 658, 691, 694 (1978), does not permit municipal liability merely because a municipality employed the alleged wrongdoer. Swan does not rely upon respondeat superior. Her allegations concerned governmental practices involving CAD/location/caution information, mental-health coding, continued retention, training and supervision, and the alleged absence of an effective correction procedure. The Atkins evidence matters to that theory because Swan alleges that a supervisory official received actual notice of the disputed classification, was specifically told that Shields had never evaluated Swan, was asked to remove the classification, and responded that he did not know how it could be corrected or removed. This fact is relevant to the pleaded municipal theory and could not simply disappear because the underlying constitutional conduct had first been reduced to an inaccurate-report claim.

The district court had to determine whether Swan adequately alleged an actionable policy, widespread custom, policymaker action, failure to train, or another recognized basis for municipal liability and whether that municipal action was the moving force behind an underlying constitutional violation.

The Fifth Circuit has applied Monell and Keenan together when a plaintiff alleges municipal First Amendment retaliation, requiring allegations both of actionable municipal policy/custom and retaliatory motivation. See Duran v. City of Corpus Christi, No. 05-40214, slip op. at 4 (5th Cir. 2006). The district court's derivative dismissal of the municipal claim therefore cannot be separated from its prior narrowing of the underlying constitutional conduct.

**DISMISSAL WITH PREJUDICE THE FRAMING ERROR ALSO PREVENTED A VALID "BEST CASE" DETERMINATION**

Finally, the same error matters to the decision to dismiss with prejudice.

Jones v. Greninger, 188 F.3d 322, 326–27 (5th Cir. 1999), recognizes the general rule that a pro se plaintiff should receive an opportunity to amend before Rule 12(b)(6) dismissal unless she has already pleaded her best case and further amendment would not produce a viable claim. That determination necessarily depends upon identifying the plaintiff's actual claim.

A court cannot reliably determine that a plaintiff has pleaded her "best case" by testing a materially different cause of action that the plaintiff repeatedly said she was not asserting.

Here Swan repeatedly identified the actual factual theory. She repeatedly objected to the accurate-report characterization. She identified Shields's lack of personal contact. She identified Holman's actual welfare-check disposition. She identified the mental-health/political classification. She identified CAD and dispatch systems.

She identified continued governmental retention and use. She identified First Amendment retaliation. She identified stigma-plus. She identified the lack of a correction process. And she identified the municipal theory.

ROA.416; ROA.473; ROA.481–83; ROA.506; ROA.779–83; Tr. 13–15, 38–43.

If any element required additional factual specificity, for example, actual curtailment under Keenan, the protected "plus" under Thompson, or the precise policy/custom and causation required by Monell, the question was whether Swan could cure that identified deficiency.

It was not whether she could state a constitutional right to an accurate police report.

She never asserted one. The with-prejudice judgment therefore magnified the framing error rather than curing it. At minimum, if this Court determines that an element of one or more claims was insufficiently pleaded, the proper disposition is vacatur of the with-prejudice judgment and remand for consideration of amendment under the actual constitutional theories Swan pleaded and preserved.

## III. PLAKE'S WRONG LAW, CASE-LAW FRAMING, AND QUALIFIED-IMMUNITY ARGUMENTS WERE PRESERVED AND SHOULD NOT HAVE BEEN ADOPTED.

Swan also preserved that Appellees' legal authorities were aimed at the wrong claim and misstated the governing law. Dkt. 84 was not a collateral filing. It was a direct objection to Appellees' "False Case Law Misstatements and Corrections." ROA.779-83. Swan identified the specific cases, identified how Appellees were using them, gave the legal correction, and asked the court not to adopt that misleading framework. ROA.779-83. This mattered because Appellees' qualified-immunity argument depended on two moves: first, changing Swan's claim into an "accurate police report" claim; and second, using authorities about pleading burdens, reputation-only claims, and report content to defeat claims Swan did not plead. The district court erred by accepting that

framework instead of addressing the actual pleaded conduct.

Jackson v. City of Beaumont Police Department: Appellees used Jackson for the proposition that Section 1983 claims against individual officials require heightened pleading when qualified immunity is raised. Swan preserved her objection to that framing. ROA.780. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993), rejected a judicially created heightened pleading requirement for municipal § 1983 liability, although Leatherman did not decide the distinct procedure applicable to individual officials asserting qualified immunity. That procedure was addressed by the Fifth Circuit en banc in Schultea v. Wood, 47 F.3d 1427, 1433-34 (5th Cir. 1995).

Schultea does not authorize a court to rewrite a plaintiff's cause of action or impose a heightened pleading standard on the complaint itself. Instead, when qualified immunity requires additional factual particularity, the district court may require a reply under Rule 7(a) tailored to the immunity defense. Id. at 1433-34. The Fifth Circuit has since made the distinction explicit: an assertion of qualified immunity "does not subject the complaint to a heightened pleading standard." Arnold v. Williams, 979 F.3d 262, 267 (5th Cir. 2020). The complaint remains governed by Rule 8, and the court determines whether the plaintiff supplied a short and plain factual statement resting on more than conclusions alone. Anderson v. Valdez, 845 F.3d 580, 590 (5th Cir. 2016).

Appellant Swan alleged concrete conduct rather than conclusions: Shields allegedly never met her, never spoke with her, never observed her, and did not conduct the welfare check; Holman conducted the

actual welfare check and cleared it; and Shields nevertheless caused mental-health and political-delusion coding to be entered into official law-enforcement and dispatch/CAD systems. The district court therefore had to test those pleaded facts against the qualified-immunity defense. It was not permitted to replace those allegations with Appellee Shields' manipulated "accurate police report" claim and then dismiss that substituted claim.

James v. Sadler: Appellant Swan objected that Appellees used James as controlling qualified-immunity pleading authority without acknowledging the later governing framework. ROA.780-81. Whatever heightened-pleading terminology appeared in older cases, the Fifth Circuit now expressly holds that assertion of qualified immunity does not subject the complaint itself to a heightened pleading standard. Arnold, 979 F.3d at 267. Under Schultea, greater factual particularity, when legitimately required, may be obtained through a Rule 7(a) reply tailored to the immunity defense. 47 F.3d at 1433-34. The judge therefore erred to the extent older pleading language was allowed to substitute for examination of the Appellant Swan's concrete factual allegations under the governing Rule 8 and qualified-immunity framework.

Rolf v. City of San Antonio: Swan objected that Appellees treated Rolf as though it supported dismissal before discovery. ROA.781. Swan specifically pointed out that Rolf followed a developed record and summary judgment. ROA.781. But Rolf also establishes a proposition directly relevant to the qualified-immunity question Appellees' manipulation avoided: government retaliation against a private citizen for exercising First Amendment rights cannot be objectively reasonable.

Rolf v. City of San Antonio, 77 F.3d 823, 828 (5th Cir. 1996). The question therefore was not whether Swan possessed a constitutional right to dictate the wording of a police report. It was whether the conduct actually alleged constituted actionable retaliation and, if so, whether the law clearly established that such retaliatory governmental action was unlawful.

Schultea v. Wood: Swan objected that Appellees used Schultea as though it revived heightened pleading in qualified-immunity cases. ROA.781-82. Schultea permits a Rule 7(a) reply tailored to qualified immunity when greater factual detail is necessary; it does not authorize a defendant or a court to rewrite the cause of action. 47 F.3d at 1433-34. Swan's pleadings and preserved clarifications identified the conduct at issue. The qualified-immunity analysis therefore had to address that conduct rather than Appellees' manipulated report-accuracy claim.

Paul v. Davis: Swan objected that Appellees used Paul as though her Fourteenth Amendment claim alleged reputation alone. ROA.782-83. Paul establishes that reputational injury standing alone does not create a federal due-process claim. 424 U.S. 693, 701-12 (1976). Swan does not contend otherwise. Fifth Circuit stigma-plus doctrine requires both governmental stigma based on concrete false factual assertions and infringement of an additional protected interest. Blackburn v. City of Marshall, 42 F.3d 925, 935-36 (5th Cir. 1995); Texas v. Thompson, 70 F.3d 390, 392 (5th Cir. 1995).

The distinction matters. The alleged mental-health and political-delusion classification supplies the asserted stigma; the fact that the classification appears in governmental records does not, by itself,

automatically supply the constitutional "plus." Under Thompson, the infringement component asks whether the State sought to remove or significantly alter a life, liberty, or property interest recognized by state law or protected by an incorporated provision of the Bill of Rights. 70 F.3d at 392.

Swan pleaded an independently protected constitutional interest: her First Amendment right to engage in reporting, petitioning, and political expression without retaliatory governmental action. She alleged that Shields used official law-enforcement mechanisms to impose stigmatizing mental-health and political-delusion classifications because of that protected activity. Swan also alleged governmental dissemination, continued maintenance and operational use of the classification, and the absence of a process to challenge or remove it. The district court therefore was required to determine whether the alleged stigma was accompanied by the constitutionally required infringement of another protected interest. It instead accepted Appellees' reputation-only manipulation and reduced the allegations to a false police report.

Wimm v. Jack Eckerd Corp.: Swan objected that Appellees used Wimm, a private civil discovery-sanctions case, to attack Swan's filings. ROA.783. The judge erred by treating Swan's objections as a volume problem instead of recognizing that the filings preserved the same recurring legal error: Appellees were manipulating the claims and relying on authorities that did not answer them.

Accurate-police-report authorities: Appellees' repeated reliance on cases about report accuracy or report wording did not answer Swan's

claim. Swan objected in Dkt. 46 and Dkt. 54. ROA.416, 506. The judge erred by adopting those authorities against a claim Swan repeatedly disclaimed in writing and orally.

Qualified immunity: Appellees' manipulation produced the wrong clearly-established-law question. Swan did not claim a freestanding constitutional entitlement to an "accurate police report." The conduct alleged was retaliatory governmental action: an officer who allegedly never met, spoke with, or observed Swan and did not conduct the welfare check nevertheless caused official law-enforcement and dispatch/CAD systems to classify her as a mental-health subject and politically delusional after Swan engaged in protected reporting, petitioning, and political expression and after the officer who actually responded found no emergency-detention basis.

The clearly established right therefore had to be analyzed under First Amendment retaliation law, not cases concerning a citizen's ability to dictate police-report wording. Long before the events alleged here, the Fifth Circuit held that governmental retaliation against a private citizen for exercising First Amendment rights cannot be objectively reasonable. Rolf, 77 F.3d at 828.

Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002\), reinforces that principle in a law-enforcement context. There, private citizens reported alleged misconduct by a Texas constable and alleged retaliatory law-enforcement action. The allegations included that constable officials ordered or encouraged employees to file false or misleading police reports involving the plaintiffs. Id. at 256 & n.3. The Fifth Circuit held that a private-citizen retaliation claim requires constitutionally protected

activity, an injury that would chill a person of ordinary firmness, and adverse action substantially motivated by the protected conduct. Id. at 258. Keenan further held that the plaintiffs had to show some actual curtailment of their protected speech and concluded that their evidence satisfied that requirement. Id. at 259-60. In its qualified-immunity analysis, the court reiterated that governmental retaliation against a private citizen for exercising First Amendment rights cannot be objectively reasonable. Id. at 261.

Keenan does not establish a freestanding constitutional right to accurate government records, and Swan does not contend that it does. Nor does Keenan eliminate Swan's obligation to satisfy the elements of a First Amendment retaliation claim. It establishes the materially different legal framework Appellees' manipulation avoided: official law-enforcement power may not be used to impose sufficiently serious adverse consequences on a private citizen in retaliation for protected speech, subject to the elements and limitations governing such a claim.

The Rule 12 inquiry therefore had to address Swan's actual allegations, including her protected reporting, petitioning, and political expression; Shields' alleged retaliatory motive; Shields' alleged absence of firsthand contact or observation; the responding officer's contrary welfare-check disposition; and Shields' alleged subsequent use of official dispatch/CAD mechanisms to impose stigmatizing mental-health and political-delusion classifications. The court also had to determine whether Swan sufficiently alleged the injury and curtailment required by controlling Fifth Circuit retaliation law. It could not avoid those questions by replacing the retaliation claim with an "accurate police

report" claim.

The district court did not conduct that inquiry. It instead granted immunity after reducing the alleged conduct to an incorrect police-report code. ROA.1139-44. Because qualified immunity was adjudicated against Appellees' manipulated version of the claim rather than the constitutional theory and conduct actually alleged, the ruling should be vacated.

The prejudice is clear. Once the district court accepted Appellees' wrong law and wrong case frame, every constitutional claim was measured against a substituted issue. That is why the error must be corrected on appeal.

## X. IV. DISMISSAL WITH PREJUDICE WAS IMPROPER

Even if this Court concludes that some element of Swan's constitutional theories required additional factual specificity, dismissal with prejudice was not the proper consequence after the district court analyzed a manipulated version of those theories.

The Fifth Circuit's rule directly addresses this situation. "Generally a district court errs in dismissing a pro se complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend." Jones v. Greninger, 188 F.3d 322, 326 (5th Cir. 1999) (citing Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998)). The exception applies where the plaintiff has already pleaded her "best case" and further amendment would not supply a viable claim. Jones, 188 F.3d at 327.

That exception cannot fairly be applied through Appellees' manipulated framing. Swan repeatedly told the district court that the claim being attacked was not the claim she pleaded. Dkt. 46, Dkt. 54, Dkt. 84, Dkt. 114; Tr. 13-15, 38-43. She specifically identified Shields' alleged lack of personal contact, the responding officer's disposition of the welfare check, the subsequent mental-health and political-delusion coding, the official dispatch/CAD systems involved, retaliation, governmental dissemination, continuing retention, stigma-plus, municipal practices, and absence of a correction process.

The district court nevertheless dismissed with prejudice after reducing those allegations to the "entry of an incorrect code in a police report" and "a police report alone—even if false." ROA.1139-40. A determination that a pro se plaintiff has pleaded her "best case" cannot reliably rest on a substituted cause of action the plaintiff repeatedly disclaimed.

The distinction is especially material here because the deficiencies potentially identified by the governing law are matters capable of being addressed through factual pleading if supporting facts exist. For example, Keenan requires the private-citizen retaliation inquiry to address protected activity, sufficiently serious retaliatory injury, retaliatory motivation, and some actual curtailment of protected speech. 290 F.3d at 258-60. Thompson requires the stigma-plus inquiry to identify not merely stigma but infringement of another protected interest. 70 F.3d at 392. If the district court believed Swan's allegations concerning those elements were insufficient, the proper question before imposing a with-prejudice judgment was whether those deficiencies

could be cured by amendment—not whether Swan possessed a freestanding right to an accurate police report.

Swan's repeated objections also demonstrate why amendment cannot be dismissed as futile merely from the court's report-accuracy analysis. Swan was consistently attempting to direct the court to different constitutional theories and different factual predicates. ROA.416, 506, 779-83; Tr. 13-15, 38-43. Yet the court entered a final with-prejudice judgment without squarely adjudicating those theories under the governing elements.

At minimum, therefore, if this Court concludes that Swan's existing allegations do not themselves state one or more constitutional claims, the proper disposition is vacatur of the with-prejudice judgment and remand so that any curable pleading deficiency may be addressed under the actual claims. Jones permits final dismissal when a pro se plaintiff has had a fair opportunity to present her best case and no viable amendment can be perceived. 188 F.3d at 327. It does not support using Appellees' manipulated claim to establish futility as to materially different constitutional claims Swan repeatedly identified.

The dismissal with prejudice should therefore be vacated. If this Court does not hold that the existing allegations themselves state the constitutional claims, it should remand for consideration of whether amendment of any identified pleading deficiency would be futile rather than allow a with-prejudice judgment entered against a substituted claim to stand.

## CONCLUSION

The district court's errors are preserved in the docket. Swan objected in Dkt. 46, Dkt. 50, Dkt. 52, Dkt. 54, Dkt. 84, Dkt. 114, and at the Nov. 19, 2025 hearing. She identified the same problem each time: Appellees were manipulating her causes of action into a report-accuracy claim, using wrong or misleading legal authority, and refusing to answer the claims actually pleaded.

The court had those objections before it. The court acknowledged Swan's notices and objections. ROA.1149 n.11. The court still dismissed the case using Appellees' manipulated frame. The judgment therefore rests on a claim Swan did not plead and repeatedly disclaimed.

Swan respectfully requests that this Court vacate the judgment and remand for consideration of the claims actually pleaded. Alternatively, if this Court concludes that any claim requires additional factual allegations, Swan requests vacatur of the with-prejudice dismissal and remand for consideration of amendment under the governing Fifth Circuit standard.

Swan preserves all rights to seek rehearing, rehearing en banc, and further review if necessary.

Respectfully submitted,

/s/ Deborah Kay Swan

Deborah Kay Swan

Plaintiff-Appellant, Pro Se

## CERTIFICATE OF SERVICE

I certify that on September 16, 2026, a true and correct copy of this Appellant's Reply Brief was served on counsel of record by the Court's CM/ECF system and/or by email or mail as permitted by the applicable rules.

Counsel for Appellees: Daniel Plake, Montgomery County Attorney's Office, 501 N. Thompson Street, Suite 300, Conroe, Texas 77301, daniel.plake@mctx.org.

/s/ Deborah Kay Swan

Deborah Kay Swan

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using 14-point type.

This brief is intended to comply with the applicable type-volume limitation for a reply brief. The word count for the argument and conclusion is approximately 6,500 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

The undersigned certifies that this document has been scanned for viruses and is believed to be virus-free.

/s/ Deborah Kay Swan